**IN THE COURT OF APPEALS OF IOWA**

No. 20-0557
Filed January 21, 2021

**IN RE THE MARRIAGE OF NATALIE M. WEINSCHENK
AND JOSEPH L. WEINSCHENK JR.**

**Upon the Petition of
NATALIE M. WEINSCHENK,**
        Petitioner-Appellee,

**And Concerning
JOSEPH L. WEINSCHENK JR.,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Clinton County, Mark R. Lawson,

Judge.


        Joseph Weinschenk appeals economic provisions of the decree dissolving

his marriage to Natalie Weinschenk.  **AFFIRMED AS MODIFIED.**



        Michael J. McCarthy of McCarthy, Lammers & Hines, LLP, Bettendorf, for

appellant.

        Robert J. McGee of Robert J. McGee, P.C., Clinton, for appellee.



        Considered by Mullins, P.J., and May and Schumacher, JJ.

**MULLINS, Presiding Judge.**

The parties, Joseph and Natalie Weinschenk, met and started dating in 2007. Thereafter, Natalie stayed with Joseph in his home in Low Moor, Iowa "on and off." In 2010, Natalie officially moved in with Joseph. According to Natalie, she assisted Joseph with remodeling the home[1] and paid rent to help cover the mortgage and utilities after she moved in. After about a year, the parties split up and Natalie moved out, but they got back together a few months later. In 2011, Joseph sold his house so the parties could build the home Joseph continued to live in at the time of the dissolution trial. In October, Joseph purchased the property for the new home and made a down payment in the amount of $49,778.26, which seems to be the entirety of the proceeds from the sale of the Low Moor home. It took about two years for the home to be built, during which Joseph lived with Natalie, and Natalie paid all the bills. The parties had two children before the marriage, born in 2013 and 2014. The parties married in 2015.

Joseph was forty-three at the time of trial. When the parties met in 2007, Joseph worked as an industrial insulator. He remained in that position until 2013, when he took a job with a railroad outfit. He was injured on the job in 2015, which resulted in surgery, and he did not return to the position thereafter. He received a settlement of roughly $183,000.00 as a result of his work-related injury. Joseph testified he used $23,000.00 of the settlement to pay medical bills and placed the remainder in two accounts for the children, about $10,000.00 of which has since

---

[1] Natalie testified Joseph is a skilled carpenter and has experience as an insulator and electrician. Her part of the remodeling involved assisting with drywall, flooring, painting, concrete work, "things like that."

been withdrawn for Joseph's use. Joseph did not work for about a year and a half after his injury. At some point, he began working odd jobs and flipping houses. Joseph's earning capacity is meticulously cloaked in a shroud of enigma. We find credible Natalie's testimony that Joseph's intent in these proceedings is to leave her "penniless."

In early 2010, Natalie began employment as a police officer. She suffered an on-the-job back injury in 2012, which required surgery. She was again injured on the job in 2017, which necessitated spinal surgery and ultimately her medical retirement in 2018. Her back is healed and she is capable of physical labor, but she has permanent nerve damage that causes her to fall sometimes. She currently receives monthly disability payments in the amount of $2990.00.

In 2014, the parties took out a $10,000.00 home equity line of credit on the home. In May 2019, Joseph paid off the line of credit with a portion of a second line of credit of $60,000.00 he took out against the home. Natalie testified, as a result, all of the equity in the marital home "has now been absorbed in debt." Joseph took out advances from the credit line of $15,000.00 on May 24,[2] $5000.00 on June 24, $5000.00 on July 26, $5000.00 on August 12, $5000.00 on August 15, $5000.00 on September 12, $3000.00 on October 9, and $15,000.00 on December 5. Joseph testified he used the funds to pay for his house, bills, and maintaining his home, which we find not credible.

---

[2] $10,000.00 of this advance appears to have been put toward paying off the first line of credit.

The parties separated for a time beginning in December 2017, but Natalie returned to the marital home for about six months in 2018 after her back surgery. She ultimately petitioned for dissolution of the parties' marriage in December 2018.

Following trial in February 2020, the court entered its decree. The court accepted a number of the parties' stipulations. The court determined the marital home to be valued at $285,000.00 and subject to a first mortgage of $173,477.00, both figures of which are supported by the evidence. Of the $49,778.26 Joseph used from the proceeds from the sale of his prior home for the down payment on the marital home, the court set off $30,000.00 as a premarital asset but declined "to set off the remaining $19,778.00 due to Natalie's substantial physical labor towards the Low Moor house, resulting in increased proceeds from the sale." As such, the court set the net marital value of the new home at $255,000.00. The court found Joseph used the line of credit he took against the home to "enrich[ ] himself at the expense of the equity in the marital residence" and "he should not be allowed to benefit by including this debt as a credit in his column of marital assets." The court awarded Joseph the home, and assigned him the debt under the mortgage and line of credit, but did not include the debt under the line of credit in the property distribution calculation. At the end of the day, Joseph was awarded

assets of $92,875.00[3] and Natalie $6821.00.[4]  The court ordered Joseph to pay Natalie an equalization payment in the amount of $42,700.00.[5]

Joseph appeals.  He argues the court erred in allocating money derived from his premarital equity in the Low Moor property to Natalie and improperly failed to credit him for a line-of-credit liability assigned to him in the decree.

Appellate review of dissolution proceedings is de novo.  Iowa R. App. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018).  While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them.  Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007).  Because the court bases its decision on the unique facts of each case, precedent is of little value.  *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009).

On Joseph's first claim of error, he complains "Natalie had only been sporadically residing in the Low Moor property prior to its sale" and "she could not have been doing any substantial work on the premises in 2011 because she was pregnant and suffered a back injury."  Joseph mischaracterizes the evidence.  True, Natalie only stayed with Joseph in the Low Moor home "on and off" from 2007 to 2010, but she helped him remodel the home throughout the course of the relationship.  Also, when she moved in for about a year in 2010, in addition to her

---

[3] The court reached a total for the assets award to Joseph of $92,575.00.  Adding the assets awarded to Joseph in the district court's balance sheet, we reach a sum of $92,875.00.

[4] The court reached an asset total for Natalie of $7121.00.  We calculate the assets awarded to her to be $6821.00.

[5] The court calculated the payment to be $42,727.00.  In its ruling provisions, the court only ordered a payment of $42,700.00.

remodeling efforts, she also paid rent to help cover the mortgage. And the home was already sold when Natalie suffered a back injury and was pregnant, which was in 2012, not 2011.

We have condoned the equitable nature of declining to grant a set off against premarital property for sweat equity of the non-premarital spouse. *See, e.g.*, *In re Marriage of Huinker*, No. 16-1663, 2017 WL 4049501, at *4 (Iowa Ct. App. Sept. 13, 2017); *In re Marriage of Barten*, No. 09-1268, 2010 WL 2598333, at *6 (Iowa Ct. App. June 30, 2010). Premarital assets are not automatically set aside to one party but are but one factor to be considered by the court. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). Upon our de novo review, we agree with the district court that declining to set off a portion of the proceeds was appropriate. Given the lack of evidence on when Joseph got the house, what he paid for it, how much remodeling costs were, and what the house was sold for, we are inclined to rely on the district court's judgment call, and we affirm the district court on this point.

Next, Joseph argues the court erred in failing to give him any credit for the liability under the second home equity line of credit.[6] The district court's findings on this issue were tantamount to a conclusion Joseph dissipated assets of the marital estate—equity in the marital home—a conclusion with which we generally agree. We part ways with the district court as to the extent the second home equity

---

[6] Joseph does not cite any legal authority supporting this argument under the respective brief point. On our de novo review, we choose to address this issue, recognizing the general equitable principles to be considered in distribution of marital property cited under an earlier brief point. *See* Iowa R. App. P. 6.903(2)(g)(3) (permitting, but not requiring, us to deem waiver of an issue).

line of credit was used to pay off the $10,000.00 first home equity line of credit that benefited the marital unit. We modify the court's property distribution on this point to credit one-half of the line of credit that benefited the marriage, $5000.00, to Joseph.

Having modified the property distribution relating to the line of credit, and factoring our calculations of the assets awarded to the parties, we modify Joseph's equalization payment to amount to $38,027.00.

**AFFIRMED AS MODIFIED.**